**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CANDICE M.,**

      **Plaintiff,**

v.                                       **Civil Action 2:23-cv-0004
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**OPINION AND ORDER**

Plaintiff Candice M. brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 8) and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff filed her application for DIB on October 26, 2020, alleging disability beginning October 21, 2020. (R. at 147–53). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on November 10, 2021. (R. at 28–49). The ALJ denied benefits in a written decision on December 10, 2021. (R. at 10–27). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. (R. at 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on January 3, 2023 (Doc. 1), and, as required, the Commissioner filed the administrative record (Doc. 7). Thereafter, the parties briefed the matter. (Docs. 8, 9, 10).

    **A.  Relevant Hearing Testimony**

The ALJ summarized the reports presented to the administration and testimony from

Plaintiff's hearing:

> [Plaintiff] alleges that she is disabled by back issues (Exhibit 1E). In disability appeal report, [Plaintiff]'s representative stated that her back has gotten worse, she can no longer really carry anything, and the pain shoots from her back down her right leg. [Plaintiff] reportedly said that atrial fibrillation was flaring up pretty often, and she has to keep a pretty close watch on her potassium because that is what is causing the Afib to flare up and this is happening at least daily. Arthritis in her hands is so bad now she has issues lifting and carrying things. She uses a heating pad and TENS unit every day for pain. Back pain keeps her from sleeping. Sleep apnea is causing issues with the Afib, but she attempted a sleep study and she couldn't wear the mask because it was causing so much pain in her lungs (Exhibit 5E).
>
> In a prehearing brief, [Plaintiff's] representative alleged that she was disabled [due to] lumbar degenerative disc disease, right hand, joint arthrosis, atrial fibrillation, hypertension, obstructive sleep apnea, and morbid obesity. He also noted that a neurologist stated he supported [Plaintiff]'s disability, while acknowledging that whether a person is disabled is an issue reserved for the Commissioner. He remarked that, combined with obstructive sleep apnea, atrial fibrillation, obesity and hypertension. [Plaintiff]'s musculoskeletal issues prevented her from remaining on task and attending work within customary tolerance. He also noted that if she were limited to sedentary or light exertional work, she would be found disabled under the "grid rules" as of her alleged onset date of disability (Exhibit 10E). However, [Plaintiff]'s representative omitted the possibility that, if limited to light or sedentary exertional work, she would not be found disabled. If she could perform the demands of her past relevant work, as is the case here.

(R. at 18).

### B. Relevant Medical Evidence:

The ALJ also discussed Plaintiff's medical records and symptoms:

> [Plaintiff] told her primary care nurse practitioner in December 2019, that she been having some hand pain for a couple of weeks. She said playing video games or cleaning mid to hand worse. She did have a history of carpal tunnel surgery in the left wrist a few years earlier. On examination, there was a slight cyst -like mass located below the right. Range of motion was normal in both hands and fingers. Tinel's and Phelan signs were negative for carpal tunnel impairment. She was prescribed naproxen and advised that she needed to be careful to take it twice a day and to wear a brace on her thumb (Exhibit 6F/18-22). Right hand X-rays taken in December 2019 showed mild to moderate scapho- trapezium/ trapezoid (STT) change at the base of the thumb, with mild degenerative changes at the third PIP and DIP joint (Exhibit 3F/7).

Lumbar x-rays in August 2020 showed mild diffuse degenerative changes, most prominent at L5-S1. There is no evidence of fracture, lesion, or pars defect (Exhibit 3F/6). [Plaintiff] was hospitalized for two days, in September 2020, the month before she alleges she became disabled. She reported chest pain, and nuclear stress test showed ischemia in the mid distal anterior wall of the heart come in the presence of a normal left ventricular ejection fraction. [Plaintiff] was noted to have atrial fibrillation with rapid ventricular response, which converted to normal sinus rhythm with the Cardizem drip. She was prescribed Lopressor and started Lovenox. [Plaintiff] was morbidly obese with a BMI of 41.21. She had, obstructive sleep apnea by history and was encouraged to use the CPAP machine. [Plaintiff] was mowing her lawn with a push mower when she developed substernal chest pressure, she said she'd been using the push lawnmower through the summer with no symptoms. She denied chest pain or pressure, shortness of breath, shortness of breath with exertion, and swelling in her extremities. She said she saw a chiropractor for back pain. At this time, [Plaintiff] indicated that she lived alone in a private residence. Cardiac catheterization showed mild diffuse coronary artery disease and three vessels and a 30% lesion in the left anterior descending artery, as well as a 60% ejection fraction with normal wall movement (Exhibit 4F/1-30). At primary care follow up the week after discharge, [Plaintiff] reported that she felt like she was in a regular heart rate now and wanted to go back to work. "Back is bothering her off and on but not as much when she is working" (Exhibit 6F/56). [Plaintiff]'s assertion that her back discomfort was only intermittent, and improved when she was engaging in her job as a private cleaner, appears inconsistent with her allegation that she is unable to work because of back pain, which worsens with activity.

[Plaintiff]'s physical therapy discharge note in August 2020 indicates that she complained of 3/10 average pain, worse with lifting cleaning supplies and her granddaughter, and standing. [Plaintiff] was observed to have a normalized gait pattern (See Exhibit 5F/8).

Lumbar MRI in October 2020 showed a small posterior disc osteophyte complex at L1-L2 causing moderate narrowing of the left lateral recess in the region of the descending left L2 nerve root, and also causing mild foraminal narrowing. There was mild rotatory levoconvex scoliosis of the lumbar spine with multilevel discogenic disease, more severe at L5-S1, but causing no central spinal canal stenosis. There was also mild bilateral foraminal narrowing at L3 through L5 (Exhibit 4F/38-39).

[Plaintiff] was seen in follow-up by her nurse practitioner in December 2020. She said her weight was 214 pounds that day and she was trying to stay active. She had been busy with her grandchildren and was looking forward to the holiday season. [Plaintiff] displayed normal musculoskeletal range of motion and pulmonary effort. She was advised to work on a heart healthy lifestyle (Exhibit 13F/62-67).

Polysomnogram in January 2021, performed for excessive daytime sleepiness and fatigue, was diagnosed poor sleep efficiency, sleep stage dysfunction, severe obstructive sleep apnea, significant arousal, and mild desaturation without any cardiac arrhythmias. She was advised to use continuous positive airway pressure. She did not qualify for supplemental oxygen (Exhibit 12F/98, 103).

In March 2021, [Plaintiff] came to the emergency room reporting that her blood pressure was around 200/90. She felt like her heart was beating harder and faster than normal. [Plaintiff] was asymptomatic in the emergency room, with normal blood pressure, and was discharged shortly after (Exhibit 9F).

[Plaintiff] told her nurse in March 2021 that she had moved in with her son, and now had to go up and down steps, 10 times a day. She had stopped working and was applying for disability.

She supposed to be wearing CPAP but has tried it since her sleep study and could not use it. The claimant had intermittent pain in both legs, 6/10 in severity. [Plaintiff] walked with a steady gait, but reported low back tenderness. She was prescribed meloxicam for arthritis pain, and Requip for restless leg syndrome (Exhibit 13F/42-48). Her hemoglobin A1c was normal 5.5%, suggesting that her lower extremity pain was likely not due to diabetic neuropathy. She had no focal neurologic defect, but it is unclear whether or not sensation was tested. [Plaintiff] had reportedly called the squad because she had a rapid heartbeat and felt shaky, but she was not admitted. She was treated in the emergency room and discharged. In the office, her blood pressure was 110/65, with a pulse of 64, in the low normal range. [Plaintiff] displayed no focal neurologic deficits and was alert and oriented (*Id.*, at 25-31). She began physical therapy in March 2021, reporting one month of increased bilateral lower extremity, knee, and low back pain. This appears to suggest that pain was not present at the level described by [Plaintiff] at her disability hearing, until very shortly before the hearing took place. She reported a recent increase in activity after moving to a house with stairs and climbing the staircase frequently.

Strength was mildly decreased, 4/5, in knees, hips, and abdominal muscles, but remained 5/5 in both ankles. She said she had difficulty climbing stairs, lifting, sleeping, and performing prolonged sitting or standing activities. She denied numbness, tingling, or sensory deficits in the lower extremities. She discontinued physical therapy as she was pursuing a recumbent bicycle for home exercise (Exhibit 14F/7-15), which appears to suggest that she believed she had the lower extremity and back strength to use such an exercise device.

Right hand x-ray, in June 2021 shows scattered mild degenerative changes in the interphalangeal joints with mild second and third metacarpal phalangeal joint and moderate first carpal metacarpal joint degenerative change. There is no evidence of acute bony abnormality (Exhibit 14F/21).

> In June 2021, [Plaintiff] told her nurse practitioner that she now lived with her sons, family, and often watched her granddaughters ages three and 10. She tried doing a sleep study, but stopped it because she couldn't wear CPAP. Restless legs are improved. She was using a heating had to calm down her back pain. [Plaintiff] was not nervous or anxious and displayed no agitation or dysphoria. She did report joined and back pain. She requested records for the disability process and was encouraged to work on stretching exercises to help with back pain (Exhibit 13F/14-19). In October 2021, [Plaintiff] said she was wearing arthritis gloves on her hands and felt like they were helping with hand pain. She reported occasional zapping pain in her left chest and arm at times and when using the TENS unit (*Id.*, at 3-12). The evidence does not show that the arthritis gloves were prescribed.

(R. at 19–21).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2024, and has not engaged in substantial gainful activity since October 21, 2020, her alleged onset date of disability. (R. at 15). The ALJ determined that Plaintiff suffered from the severe impairments of degenerative disc disease, obstructive sleep apnea, obesity, hypertension, and atrial fibrillation. (*Id.*). Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment. (*Id.*).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [Plaintiff] has the residual functional capacity to light work as defined in 20 CFR 404.1567(b) except she can occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs. She should avoid ladders, ropes, or scaffolds. [Plaintiff] can frequently handle with the right upper extremity. She should avoid commercial driving and workplace hazards such as moving machinery and unprotected heights. She is expected to be off task 5 min every hour not to exceed 30 min of the work day.

(R. at 17).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. at 19).

The ALJ relied on testimony from a Vocational Expert ("VE") to determine that Plaintiff is capable of performing her past relevant work as a housecleaner. (R. at 22). Consequently, the ALJ concluded that Plaintiff was not disabled. (R. at 23).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

In her Statement of Errors, Plaintiff contends that the ALJ erred by failing to provide sufficient reasons for rejecting Plaintiff's allegations that her impairments produce disabling restrictions. (Doc. 8 at 9–14). More specifically, Plaintiff says that the ALJ should have restricted her to sedentary work with only occasional handling with the right upper extremity because of her

pain. (*Id.* at 10–11). The Commissioner counters that the ALJ properly considered the record as a whole, including the objective medical evidence in the form of clinical exam findings and imaging results, the effectiveness of treatment, any aggravating factors, her daily living activities, and the administrative findings of two state agency medical consultants. (Doc. 9 at 4–13). As explained below, the Court agrees with the Commissioner.

A social security claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). The RFC assessment must be based on all the relevant evidence in a case file. *Id.*; s*ee also* 20 C.F.R. §§ 404.1513(a), 404.1520c (2017). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating those symptoms. *See* 20 C.F.R. § 404.1529 Social Security Ruling (SSR) 16-3p, 2016 WL 1119029, *3 (March 16, 2016).[1] First, the ALJ must determine whether the individual has a medically determinable physical or mental impairment that reasonably can be expected to produce the symptoms alleged. Second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. *See also* 20 C.F.R. § 404.1529(c)(3). In performing this

---

[1] Soc. Sec. R. (SSR) 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms," superseded SSR 96-7p and became applicable to decisions issued on or after March 28, 2016. *See* SSR 16-3p, 2017 WL 5180304 (October 25, 2017) (clarifying applicable date of SSR 16-3p).

assessment, the ALJ is not required to analyze all seven factors but must show that she considered the relevant evidence. *Roach v. Comm'r Soc. Sec.*, No. 1:20-cv-01853-JDG, 2021 WL 4553128, at *10–11 (N.D. Ohio Oct. 5, 2021).

The ALJ's assessment of an individual's subjective complaints and limitations must be supported by substantial evidence and be based on a consideration of the entire record. *Rogers*, 486 F.3d at 247 (internal quotation omitted). And it remains the province of the ALJ—and not the reviewing court—to assess the consistency of subjective complaints about the impact of a plaintiff's symptoms with the entire record. *See id.* Therefore, "absent a compelling reason," an ALJ's consistency determination will not be disturbed. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

> When discussing Plaintiff's subjective complaints, the ALJ determined:
>
> With respect to the nature of [Plaintiff]'s symptoms, precipitating and aggravating factors, the medications taken and any side-effects, and other measures used to relieve the symptoms, [Plaintiff] testified that she lived with her son, his wife, and his 10 and 3 year-old children. She had a drivers' license but said that sometimes her hands cramp on the steering wheel. She wears arthritis gloves and takes medication. She previously worked cleaning houses and offices, and as a waitress and cashier. She did not think she could've continued working because of pain in her back and hands, so bad that she can't move. She doesn't have a cane, but when cleaning houses she would lean on her broom or mop and hold onto the counter. She uses a heating pad and a TENS unit. If she sits for more than half an hour, she has trouble standing up straight. She sometimes has to sleep in a recliner. She is sometimes able to play games on her laptop but can't do it alone because of swelling in her thumb that she has been told is arthritis. Sometimes her sister comes over and they play cards for an hour. She prepares simple foods, but others in the house do most of the cooking. Others in the family do most of the chores. [Plaintiff] said she could not loosen lids on containers, lift more than 10 pounds, or stand or walk for more than 15 minutes. The chiropractor told her she had curvature of the spine, but she stopped going because the treatment wasn't helping her. She drives her older granddaughter to school and the little one goes to a babysitter. She helps her daughter-in-law prepare meals, and does her own laundry.

(R. at 18–19).

After summarizing the record, the ALJ determined:

>As for [Plaintiff]'s statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because [Plaintiff]'s assertion in March 2021 that she had been having significant pain in her back, knees, and hips for one month, since moving in with her son and being obliged to climb stairs, suggests that her discomfort was not severe throughout most of the period under consideration (Exhibit 14F/7-15). She recently told her nurse that she often watched her granddaughters, ages 10 and three (Exhibit 13F/14-19), and reported her disability hearing that she was able to play video games (Exhibit 6F/18), drive a car, and play cards with her sister, though she would develop hand pain. Her activities suggest manipulative abilities that exceed the disabling limitations, she reported that her hearing.

(R. at 21).

"In summary," the ALJ concluded:

>[W]hile [Plaintiff] has medically determinable impairments that could reasonably cause some symptoms and limitations, the above evidence shows that [Plaintiff]'s testimony regarding the extent of such symptoms and limitations is not fully supported. However, [Plaintiff]'s complaints have not been completely dismissed, but rather, have been included in the residual functional capacity to the extent that they are consistent with the evidence as a whole. Nevertheless, in considering the criteria enumerated in the Regulations, Rulings, and case law for evaluating [Plaintiff]'s subjective complaints, [Plaintiff]'s testimony was not persuasive to establish an inability to perform the range of work assessed herein. The location, duration, frequency, and intensity of [Plaintiff]'s alleged symptoms, as well as precipitating and aggravating factors are adequately addressed and accommodated in the above residual functional capacity.
>
>As the subjective complaints in the record do not support further reduction of the established residual functional capacity, [Plaintiff] retains the residual functional capacity as described above.

(R. at 22).

Because of her hand pain, Plaintiff urges more handling restrictions than the ALJ included in the RFC. But the ALJ considered medical evidence inconsistent with Plaintiff's subjective reports of disabling hand pain. The ALJ noted that in December 2019, Plaintiff saw a primary care nurse for her hand. (R. at 19) (citing R. at 341). At the appointment, the nurse found a cyst-like mass below Plaintiff's right wrist but found no signs of carpal tunnel impairment. (R. at 19) (citing R. at 345). The ALJ considered that, later in December 2019, Plaintiff had an x-ray of her

9

hand that showed only "mild to moderate scapho- trapezium/ trapezoid (STT) change at the base of the thumb, with mild degenerative changes at the third PIP and DIP joint." (R. at 19) (citing R. at 255). The ALJ noted that in June 2021, an x-ray of Plaintiff's right hand showed "mild degenerative changes in the interphalangeal joints with mild second and third metacarpal phalangeal joint and moderate first carpal metacarpal joint degenerative change" but not evidence of acute bone abnormality. (R. at 21) (citing R. at 622).

The ALJ also considered regulatory factors in evaluating Plaintiff's subjective symptoms. The ALJ considered Plaintiff's daily activities, noting that her "activities suggest manipulative abilities that exceed the disabling limitations" that Plaintiff reported at her disability hearing. (R. at 21). These activities included that Plaintiff played video games, drove a car, and played cards. (R. at 21) (citing R. at 39–40, 43–44, 532, 581). The ALJ wrote that Plaintiff still engaged in these activities, even "though she would develop hand pain." (R. at 21).

The ALJ further highlighted that Plaintiff treated her hand with both medication and other measures to alleviate her discomfort. (R. at 18). Specifically, Plaintiff was prescribed Naproxen and a thumb brace when she saw her primary care nurse in 2019. (R. at 19) (citing R. at 345). Additionally, the ALJ noted that Plaintiff reported that she took arthritis medication (Meloxicam) and Aleve, without side effects; and wore arthritis gloves to help with the pain, even though the record does not reflect that the gloves were prescribed. (R. at 18, 20–21) (citing R. at 33, 37, 38, 522). The ALJ highlighted that Plaintiff "felt like [the arthritis gloves] were helping with hand pain." (R. at 21) (citing R. at 522). Thus, the ALJ explained why she found Plaintiff's allegations about the intensity of her hand pain to be inconsistent with the objective medical evidence and other evidence as described in SSR 16-3p, and the ALJ's analysis has record support. Accordingly, there was no error.

Plaintiff also challenges how the ALJ analyzed her back pain, arguing that the ALJ should have limited her to sedentary work because of her troubles standing for prolonged periods. Ultimately, the ALJ found Plaintiff's subjective reports of disabling back pain to be inconsistent with the record evidence. (*See* R. at 36–37).

The ALJ turned to the medical records first. She considered an August 2020 lumbar x-ray that "showed mild diffuse degenerative changes," but "no evidence of fracture, lesion, or pars defect." (R. at 19) (citing R. at 254). The ALJ also relied upon a physical therapy discharge note from the same month, wherein Plaintiff was observed to have a normalized gait pattern and rated her back pain as only three out of ten, although the pain was made worse when she was lifting cleaning supplies, lifting her granddaughter, or standing. (R. at 20) (citing R. at 302). The ALJ also considered a September 2020 hospital record that indicated Plaintiff saw a chiropractor for back pain (R. at 19) (citing R. at 258), but elsewhere noted that Plaintiff stopped going because the treatment was not helping her. (R. at 19) (citing R. at 41–42). The ALJ further noted that a lumbar MRI in October 2020 "showed a small posterior disc osteophyte complex at L1-L2 causing moderate narrowing of the left lateral recess in the region of the descending left L2 nerve root, and also causing mild foraminal narrowing." (R. at 20) (citing R. at 293). The ALJ considered that the MRI also showed that there was "mild rotatory levoconvex scoliosis of the lumbar spine with multilevel discogenic disease, more severe at L5-S1, but causing no central spinal canal stenosis" and "mild bilateral foraminal narrowing at L3 through L5." (R. at 20) (citing R. at 294). The ALJ cited a medical report from March 2021, reporting that Plaintiff had low back tenderness but walked with a steady gait. (R. at 20) (citing R. at 565).

The ALJ also considered that, in March 2021, Plaintiff began physical therapy after "reporting one month of increased bilateral lower extremity, knee, and low back pain" after moving

11

to a house with stairs. (R. at 20–21) (citing R. at 608). But, as the ALJ highlighted, Plaintiff stopped physical therapy to pursue home exercise on a recumbent bicycle. (R. at 21) (citing R. at 616). The ALJ also considered that, in June 2021, Plaintiff's nurse practitioner encouraged her to "work on stretching exercises to help with back pain" and that Plaintiff declined more physical therapy. (R. at 21 (citing R. at 537)).

The ALJ then considered regulatory factors in evaluating Plaintiff's subjective symptoms. The ALJ looked to Plaintiff's daily activities. (R. at 21). The ALJ noted that Plaintiff often watched her granddaughters, and that Plaintiff reported that she was "trying to stay active," used a push mower, and climbed stairs. (R. at 19–20) (citing R. at 258, 532, 558, 581). More still, the ALJ discussed the duration and frequency of Plaintiff's pain. She relied upon Plaintiff's "assertion in March 2021 that she had been having significant pain in her back . . . for one month, since moving in with her son and being obliged to climb stairs." (R. at 21) (citing R. at 558). The ALJ explained that this suggests that Plaintiff's pain was "not severe throughout most of the period under consideration." (*Id.*). The ALJ also highlighted that according to one record, Plaintiff asserted her back was "bothering her off and on[,]" implying that "her back discomfort was only intermittent[.]" (R. at 20) (citing R. at 380). And, in noting that Plaintiff stopped physical therapy to pursue home exercise on a recumbent bicycle, the ALJ highlighted that this suggests that "[Plaintiff] believed she had the lower extremity and back strength to use such an exercise device." (R. at 21) (citing R. at 616).

The ALJ further discussed medication and other treatments that Plaintiff used to alleviate her back pain. Plaintiff used a heating pad daily to "calm down her back pain," and that three or four times a week, she used a TENS unit and took Aleve, with no noted side effects. (R. at 18, 21) (citing R. at 36–38, 277, 522, 532).

12

Based upon the above analysis, the ALJ limited Plaintiff to light work. Plaintiff argues that sedentary work is a better fit for her abilities, but "[d]iscretion is vested in the ALJ to weigh all the evidence." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009). Here, the ALJ explained why she found Plaintiff's allegations about the intensity of her back pain to be inconsistent with the objective medical evidence and other evidence as described in SSR 16-3p, and the ALJ's conclusion is supported by substantial evidence.

One final point. Though Plaintiff does not raise it in her Statement of Errors, the Undersigned notes that the ALJ made a mistake. The ALJ quoted a medical report, writing Plaintiff's "[b]ack is bothering her off and on but not as much when she is working." (R. at 20) (citing R. at 380). The record actually says, "Back is bothering her off and on but not as much *as* when she is working." (R. at 380) (emphasis added). In *Charles W. v. Commissioner of Social Security*, the ALJ similarly misstated the record. No. 322CV00312DJHCHL, 2023 WL 5011745, at *7 (W.D. Ky. July 5, 2023), *report and recommendation adopted sub nom. Washburn v. Comm'r of Soc. Sec.*, No. 3:22-CV-312-DJH-CHL, 2023 WL 5003585 (W.D. Ky. Aug. 4, 2023). There, the ALJ misstated a consultative examiner's opined limitations. But the court found no reversible error because "the other portions of [the ALJ's] decision and RFC analysis make clear that [the ALJ] did not think [the plaintiff] was as limited as he alleged." *Id.* at *8–9. *Cf. Wysocki v. Berryhill*, No. CV 16-11753, 2017 WL 3084109, at *6 (E.D. Mich. June 30, 2017) ("It is true that the ALJ misstated some [of Plaintiff's] testimony, but [the ALJ's] credibility analysis is otherwise supported [by] substantial evidence."), *report and recommendation adopted sub nom. Wysocki v. Colvin*, No. 16-11753, 2017 WL 3051016 (E.D. Mich. July 19, 2017); *Smith v. Kijakazi*, No. 3:20-CV-314-HBG, 2021 WL 4714636, at *11 (E.D. Tenn. Oct. 8, 2021) ("The ALJ considered a multitude of factors, as already discussed, in making the RFC finding — not just the misstated

13

portions of Plaintiff's testimony . . . the ALJ provided a detailed analysis of the other relevant evidence supporting his RFC finding — making this harmless error at most."). The court also noted that under prior regulations, this kind of procedural error in considering a medical source opinion was harmless "where the Commissioner has met the goal of … the procedural safeguard of reasons." *Charles W.*, 2023 WL 5011745, at *7 (quoting *Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 438 (6th Cir. 2018)) (citation and internal quotations omitted).

So too here. As discussed in detail above, the ALJ pointed to inconsistences in Plaintiff's testimony regarding her daily living activities, considered a wealth of medical records showing generally mild or moderate physical impairment and normalized gait, and highlighted multiple ways that Plaintiff managed her pain. (R. at 19–21, citing R. at 36–38, 254, 258, 277, 294–94, 302, 522, 532, 565, 581). And the ALJ correctly quoted the portion of the misstated medical record wherein Plaintiff described her back pain as "only intermittent." (R. at 20) (citing R. at 380). Accordingly, despite the ALJ's mistake, her conclusion about Plaintiff's subjective reports of her symptoms was made clearly and according to the law and is supported by substantial evidence. *See Rogers*, 486 F.2d at 247.

**IV.    CONCLUSION**

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 8) is **OVERRULED** and that judgment be entered in favor of Defendant.

IT IS SO ORDERED.

Date:   December 8, 2023                    /s/ Kimberly A. Jolson
                                            KIMBERLY A. JOLSON
                                            UNITED STATES MAGISTRATE JUDGE